IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| CHARLES A. DAVIS, | ) | Civil No. 08-1336-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| COMMISSIONER of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

Tim Wilborn
Attorney at Law
P.O. Box 2768
Oregon City, OR 97045

      Attorney for Plaintiff

Dwight C. Holton
Acting U.S. Attorney
Adrian L. Brown
Asst. U.S. Attorney
1000 S. W. Third Avenue, Suite 600
Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Willy M. Le
Special Asst. U.S. Attorney
Social Security Administration
701 5th Avenue, Suite 2900, M/S 901
Seattle, WA 98104-7075

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Charles Davis brings this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of a final decision of the Commissioner of Social Security

(the Commissioner) denying his applications for Disability Insurance Benefits (DIB) and

Supplemental Security Income (SSI).  Plaintiff seeks an order remanding this action to the

Social Security Administration (the Agency) for an award of benefits, or for further

proceedings.

For the reasons set out below, the decision of the Commissioner should be reversed

and this action should be remanded to the Agency for an award of benefits.


**<u>Procedural Background</u>**

Based upon applications for benefits that are not at issue here, plaintiff was previously

found to be disabled as of January 1, 1993, because of impairments caused by drug and/or

alcohol addiction.  In 1996, Congress amended the definition of disability under the Social

Security Act (the Act) to provide that an individual is not considered disabled if drug

addiction or alcoholism would be "a contributing factor material to the Commissioner's

determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  In addition, the Act

was amended to provide that the disability benefits of any individual who would not be

disabled if he ceased his substance abuse would be terminated as of January 1, 1997.

FINDINGS AND RECOMMENDATION - 2

Because plaintiff's substance abuse was material to a finding of disability, his benefits ceased in January, 1997.

Plaintiff filed applications for DIB and SSI on November 27, 2000, alleging disability beginning on November 25, 2000. These applications were denied initially on March 16, 2001. He again filed concurrent applications for benefits on July 31, 2002, alleging disability beginning on November 25, 2000. These applications were denied initially on October 11, 2002.

Plaintiff filed the applications for DIB and SSI at issue here on May 6, 2004, alleging, as in his two sets of earlier concurrent applications, that he had been disabled since November 25, 2000.[1] After his applications were denied initially on January 26, 2005, and upon reconsideration April 6, 2005, plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

On June 12, 2007, a hearing was held before ALJ Jean Kingrey. On August 31, 2007, ALJ Kingrey issued a decision finding that plaintiff was not disabled within the meaning of the Act. That decision became the final decision of the Commissioner on September 12, 2008, when the Appeals Council denied plaintiff's request for review. In the present action, plaintiff seeks review of that decision.

---

[1] In the decision at issue in the present action, the ALJ noted that plaintiff's use of the same date of alleged onset of disability in the present applications constituted an implied request to reopen the prior applications. The ALJ stated that the denial of the earlier applications was "final and binding," and would not be reopened. Plaintiff does not dispute the ALJ's conclusion in this regard: In his opening memorandum, plaintiff states that the alleged onset date "appears to be incorrect," and that plaintiff instead has been disabled since April, 2004.

**Factual Background**

Plaintiff was born on March 6, 1960, and was 47 years old at the time of the hearing before the ALJ.  He has a high school education.  Plaintiff earned nearly $7,800 in 2001.  His brief periods of employment during 2002, 2003, and 2004 did not yield income sufficient to constitute substantial gainful activity.  Plaintiff alleges that he is disabled based upon mental impairments and physical impairments.   His physical impairments include obesity and cervical spine degenerative disc disease which resulted in a C5-6 and C6-7 discectomy and a C5-C7 fusion with bone graft and an anterior spinal plate.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

## Medical Record

Plaintiff fell on a floor on November 24, 2000.  At the emergency room, a "dry hematoma" at the back of his head was noted, and it was noted that plaintiff had lost consciousness.  Plaintiff had tenderness in his cervical spine and bilateral arm and hand weakness.  A cervical spine MRI showed disc herniation with cord impingement at C5-C7 and left sided neuroforminal encroachment at C3-C4.

On December 5, 2000, plaintiff underwent a C5-C6 and C6-C7 anterior cervical discectomy and C5-C7 fusion with anterior iliac crest bone graft and a Synthes anterior spinal plate.  Chart notes indicate that plaintiff was walking well with a cane by December 28, 2000, and continued to have some left distal upper extremity weakness, especially in his grip.

Plaintiff returned to work as a dishwasher some time after his surgery, and earned nearly $7,800 in 2001.

Plaintiff's girlfriend, Ms. Coffman, took plaintiff to the Rogue Valley Medical Center on April 24, 2004.  Dr. Kenneth Buccino reported that plaintiff rocked in a wheelchair and answered only "yes" or "no" to questions.  Ms. Coffman and another of plaintiff's friends told Dr. Buccino that plaintiff had been agitated and had experienced bad nightmares during the previous week.  Ms. Coffman said that plaintiff had a history of bipolar disorder and difficulties with stress after serving in the Gulf War.[2]  Dr. Buccino was told that plaintiff had been working at a construction site until two weeks earlier, and had been having some pain in his right leg which had been struck by a piece of falling sheetrock.  Ms. Coffman said that plaintiff had been off his Risperdol and Trazodone for several months, and she was hoping

---

[2]As the ALJ noted in her decision, though plaintiff had served in the military, he did not serve in the Gulf War and never served outside of the United States.

that he might get back on his medications, which she thought might help.  Dr. Buccino noted

that plaintiff was moving all his extremities on command and had good symmetric strength,

but had intermittent twitching that was not consistent in location or direction.  Though

plaintiff and Ms. Coffman denied use of drugs or alcohol, the preliminary results of a urine

drug screen were positive for methamphetamine.  When Dr. Buccino raised this issue with

plaintiff, neither plaintiff nor Ms. Coffman seemed surprised or upset by his comment.

They agreed that methamphetamine was in plaintiff's system, and that it might be

contributing to his difficulties.  Dr. Buccino diagnosed a mood disorder, possibly secondary

to methamphetamine or underlying bipolar disorder or Post Traumatic Stress Disorder

(PTSD), and right leg pain.  Plaintiff's medications were restarted under the direction of

Dr. Phillips.

Dr. Molly Davis was asked to conduct a neurological consultative examination of

plaintiff "for possible neurologic etiology for a constellation of signs/symptoms.  Rule out

Huntington's chorea."  Dr. Davis examined plaintiff on September 24, 2004.  She noted that

plaintiff's girlfriend (Ms. Coffman) provided plaintiff's history and did much of the talking.

Dr. Davis noted that plaintiff's girlfriend reported that plaintiff "awoke one day in April with

complete retrograde amnesia – he did not know his own name, who she was, and recalled

none of his personal history.  He was also unable to perform any of his [activities of daily

living] without assistance."  She described plaintiff's presentation as follows:

> Throughout the interview today, Mr. Davis behaved in a childlike
> manner, picking up instruments in the room and examining them.  He
> would turn on and off the light switches on the view boxes and laugh
> and clap when the lights turned on.  He asked frequent questions about
> the equipment and appeared unable to do simple tasks.  For instance,
> when I asked him to get onto the exam table, he walked past the step
> and tried to climb up the side of the table, then was redirected to the
> step.  His affect was volitile [sic] and unpredictable – at times he

would laugh and clap like a small child, at other times he became tearful when asked to perform certain tasks (i.e., to draw a clock face or to read the sentence "close your eyes" in the MMSE), and at one point he became angry and verbally aggressive toward the attending physician, upset because he perceived the doctor to be "belittling."

In her assessment, Dr. Davis stated that plaintiff's exam was:

completely non-revealing; there was no evidence of any objective abnormalities, and when his exam was not normal, i.e., with gait, FTN, and balance, it was always in a pattern which could be easily feigned. There is no unifying diagnosis to explain his signs and symptoms, and the pattern of deficits cannot be explained by neurophysiologic process. With regard to the question of possible Huntington's disease, there was no evidence of choreoform movements on exam today. In addition, the onset of symptoms in Huntington's disease is gradual, as opposed to sudden, and this is true for other possible disease processes that could partially explain his symptoms (i.e., a dementing process, a prion disease, spinocerebellar ataxias). Other processes would have a waxing/waning course, such as a diagnosis of complex partial seizures or episodic precipitous onset and then plateaud [sic] for the past 6 months with no worsening but no improvement; the only disease process which would fit such a pattern would be a sudden event, such as a CVA. His pattern of deficits, however, do [sic] not correlate to any particular vascular distribution. Other disease processes, such as those listed above, would show progression with time.

The differential diagnosis at this point includes conversion disorder, fictitious [sic] disorder, and malingering, and there is clear evidence of both primary and secondary gain. All of Mr. Davis' needs are currently attended to by his girlfriend, and he has constant attention from her. It appears that they are also applying for disability and hope that his girlfriend can be monetarily reimbursed for her role as full-time caretaker . . . Since conversion/facticious disorders always have to be diagnoses of exclusion, it is reasonable that an MRI has been performed. Should there be any evidence of abnormality on this, we would be happy to re-consult and pursue further workup . . . .

In an addendum to this report, Steven Johnson, Dr. Davis' supervising neurologic professor, indicated that he supported Dr. Davis' assessment, and thought that "malingering should be entertained as a diagnosis." He added that "[o]ther psychiatric diagnosis should also be entertained, such as conversion disorder," but indicated that he would "leave this to psychiatry to evaluate."

FINDINGS AND RECOMMENDATION - 8

Les Garwood, D.O., one of plaintiff's treating physicians, referred plaintiff to Francis Gilbert, Ph.D., a psychologist, for testing.  In referring plaintiff, Dr. Garwood stated that plaintiff

> presents with an abrupt onset of severe dysfunctionality including loss of intellectual capacity, but with lacunae preserved; psychosis, involuntary movements and apraxias and dysarthirias; he is reminiscent of a Huntington's Chorea patient.  I need help establishing a catalogue of and a baseline for his neuropsychological deficits and capacities in case this is progressive, and for any other diagnostic/etiologic impressions; pat is unable to give much meaningful hx himself; his GF seems reliable.

In a report completed on November 8, 2004, Dr. Gilbert set out the results of plaintiff's psychological testing conducted on August 24th and 25th, 2004.  Dr. Gilbert reported that testing of plaintiff required two days, with the testing discontinued after one hour on the first day because plaintiff was tired and took many breaks.  Some of the tests could not be administered because plaintiff reported that he could not read and write.  Dr. Gilbert noted that, though plaintiff seemed to recognize some numbers, he did not know enough numbers to complete the Trails A practice test.  He also noted that some of the tests were modified because plaintiff could not remember right from left.

Plaintiff's WAIS-III scores were as follows: Verbal IQ–59, Performance IQ–75, Full-Scale IQ–63.  The HRNB tests showed "diffuse impairment, with stronger lateralization to the left than to the right.  There is some consistency in the findings, with tapping, grip strength, and tactile form recognition all showing more left-sided impairments."

Dr. Gilbert summarized his conclusions and recommendations as follows:

> Testing reveals substantial impairment, with the veteran showing multiple cognitive difficulties, including extremely low intelligence. While history suggests that his test results are colored by emotional state and the possibility of primary and secondary gain, I am reluctant to attribute his poor performance to malingering.  It is quite difficult

to fake a pattern of lateralization, and what I see here are results that
a[re] internally consistent in most, though not all, of the results.

I have reviewed the report from Molly Davis, M.D., who performed an
evaluation of Mr. Davis in the PVAMC Movement Disorders Clinic
(report dated 9-24-04).

****

Although I defer to Dr. Davis' obvious familiarity with the signs and
symptoms of various neurological disorders affecting movement, I remain
unconvinced that Mr. Davis's problems are primarily psychiatric.  Mr. Davis's
problems with reading, his gait disturbance, his inability to read numbers
(as opposed to his ability to manipulate numbers arithmetically when they are
presented verbally), his frontal lobe impairment, and his various left-cortex
sensory impairments, suggest to me that there is an underlying
neuropathological process.

An MRI was considered at one point, and I believe this still is indicated.
My thought is that particular emphasis should be placed on reviewing the area
of cuadate nucleus.  There is evidence of impairment of fine motor speed,
impaired logical analysis, and lack of flexibility of thinking.  This, together
with the generalized cortical impairment, lateralization and gait disturbance,
point to some type of subcortical disorder, even in the absence of choreoathoid
movements.

At the request of the Agency, Edwin Pearson, Ph.D., performed a psychodiagnostic

assessment of plaintiff on September 27, 2004.  Dr. Pearson noted that he obtained most of

the information about plaintiff from Ms. Coffman, and opined that, without her help, he

"would have obtained very little information from [plaintiff] concerning his current status."

Dr. Pearson reported that plaintiff  claimed not to remember anything about his

childhood, and said that he had not recognized his parents when he saw them a short time

earlier.  Ms. Coffman told Dr. Pearson that plaintiff was in normal health until April 28,

2004, when he woke up and told her that he did not know who he was or who she was.  She

reported that he had subsequently exhibited severe problems with both remote and recent

memory, had developed a variety of tics, and had impaired coordination.  Ms. Coffman said

that plaintiff had been able to read at a basic level before April, 2004, but at the time of the

interview could not accurately identify one-digit numbers or the letters of the alphabet.  She

reported that plaintiff became fearful in social situations and was extremely dependent upon

her.  Dr. Pearson stated that plaintiff appeared to have an "infantile kind of relationship" with

Ms. Coffman.  He noted that Ms. Coffman seemed to be "content to care for him as needed,"

and was "trying to become a paid live-in care provider to him."  Based upon information

supplied by plaintiff and/or Ms. Coffman, Dr. Pearson indicated that plaintiff had served in

the Marine Corps in Panama.  As noted in footnote 2 above, this is not true.

    In summarizing plaintiff's mental disorders, Dr. Pearson stated that

> [w]hat exactly has happened to Charles is under investigation.  One
> line of thinking is that many of the symptoms are similar to those
> associated with Huntington's disease.  Another line of thinking is that
> he contracted some form of encephalitis.  There are many unusual
> physical movements that have been occurring since April of 2004.
> These are startle-type full-body jerking movements, rocking
> movements, wringing of hands, and at times a pill-rolling kind of
> movement with his hands.  His gait has become quite unusual.  He
> walks with a rather stiff, high-stepping, wide-based gait.  He looked
> extremely unsteady.  This was not something he produced for the
> examiner.  As a matter of fact, the examiner saw Charles and his
> partner walking in town about two hours after the interview, and the
> same, very peculiar gait was occurring.  He had a great deal of
> difficulty stepping off curbs.  He held Ms. Coffman's hand while
> ambulating.  He had great difficulty going up and down stairs.

    Dr. Pearson reported that plaintiff said he had used alcohol and opiates in his early

20's, and that Ms. Coffman said there had been "no known substance abuse problems in many

years. . . ."  Plaintiff told Dr. Pearson that he awoke every day complaining of being

exhausted, that he was often afraid to go to sleep because of "horrible nightmares every

night," and that he had "giants" in his head.

Dr. Pearson characterized plaintiff's demeanor as "extremely child-like," and stated that he believably reported auditory hallucinations and seemed "quite fearful in general." Plaintiff stated that he did not know the year, month, or day, and cried when he was asked for that information.  He could not read or write simple sentences, and testing seemed to frighten him.

Dr. Pearson summarized his impressions as follows:

> Charles impresses this writer as a man with as-yet inadequately diagnosed dementia.  It does not seem possible that the symptoms observed were consciously designed for effect.  In addition, there appears to be a history of attention-deficit/hyperactivity disorder during childhood, and quite possible arrested psychosocial development.  Hopefully there are other medical records available that might shed some additional light on the course of the illness to date. . . . Charles is absolutely unemployable.  There is not a chance he would be able to live independently in the community.  It seems reasonable to assume that he will need a care provider if he is to live in the community.

Dr. Pearson diagnosed Dementia NOS and Attention-Deficit/Hyperactivity Disorder NOS.  He added that there was "possibility of Personality Disorder and sub-average general intelligence prior to the severe problems that have been occurring in this man's life since April of 2004."

An MRI of plaintiff's brain was taken on May 5, 2005.  The findings were summarized as follows:

> The MRI of the brain is within normal limits with no intracranial abnormalities.  There is no abnormal signal in the parenchyma on the T1, T2-weighted, or diffusion-weighted images, and no abnormal enhancement on the post-Gadolinium studies.  The cisterns, ventricles, and sulci appear normal.  The flow voids of the cerebral vasculature appear normal.

In a report based upon an examination of plaintiff conducted on July 13, 2005, Dr. Davis noted that she had been asked to reevaluate plaintiff because Dr. Gilbert had

opined that it was difficult to "fake a pattern of lateralization," and had concluded that

plaintiff's symptoms suggested "that there is an underlying neuropathological process."

Dr. Davis reported that

> since his last visit, Mr. Davis has not recovered his memory of events
> prior to April 2004, but he has been able to learn new skills.  His
> girlfriend did receive reimbursement from the state to act as his full
> time caretaker.  She reports that he can n[o]w recognize and copy
> letter[s] and has started to be able to read Dr. Seuss books.  They
> watch Wheel of Fortune to reinforce the letters.  He has re-learned how
> to tell time as well.  He continues to have AH of voices, which last
> week were quite disturbing and "told me to hurt myself or my
> girlfriend," but with the discontinuation of citalopram, the voices
> "aren't as angry," though he is reluctant to share the content.

Dr. Davis concluded that the reexamination of plaintiff and review of the MRI:

> again do not support any neurologic etiology, including no evidence
> of movement disorder, which could explain his deficits.  There were
> clear and unequivocal exam findings which were functional–most
> prominently his gait, with a classic atasia/absaia picture with dramatic
> swaying but no actual [] loss of balance, and during tandem gait, when
> he actually demonstrated excellent balance, standing on one foot for >
> 10s, while attempting to place one foot in front of the other.  It should
> be stressed, however, that in patients with a conversion disorder, they
> are not volitionally "faking" the presentation.  Although there are
> significant primary and secondary gain issues, I do think that
> conversion is more likely than malingering.

Dr. Garwood was plaintiff's primary treating psychiatrist at the VA Medical Center.

In chart notes dated November 2, 2004, Dr. Garwood stated that plaintiff had some of the

most severe PTSD-related dissociative symptoms he had ever seen, and that this had resulted

in pathological regression.  He added that "this has reached psychotic proportions," but he

was "not convinced it's schizophrenia."

In a chart note dated May 10, 2005, Dr. Garwood reported that plaintiff was pleasant,

polite, cooperative, acted in a "child-like manner," and rocked from side to side.

Dr. Garwood opined that "PT IS CLEARLY DISABLED DUE TO HIS COMPLEX AND

MULTIPLE MENTAL HEALTH ISSUES, INCLUDING PTSD, AND PSYCHOSIS NOS."

In notes of an office visit on April 6, 2006, Dr. Garwood described plaintiff as:

> Very pleasant; polite; cooperative; child-like in regressive way;
> includes phonation of toddler; emotional development stage of
> pre-pubescence; this is chronic; this is a primitive defense against
> overwhelming PTSDsx; yet pt can pick up quickly on adult-level
> wit and double-entendres; none of this is "volitional" or
> manipulative, and is largely unconscious, with some at pre-conscious
> level and a little at conscious level; insight is provoked by
> circumstances/frustrations/symptoms; responds well to simple
> support/praise/caring; good grooming and hygiene.

> A. MH problems in focus today: Closed head injury resulting in
> "Organic Personality d/o"; PTSD (severe) with related psychotic d/o
> NOS; all are improved slightly since last visit; increased dose of
> risperdal; this drug has proven the best tolerated and most effective of
> the SGAs currently available; metabolic syndrome may still be a risk;
> monitoring for this so far, not a major problem; need to re-check
> lipids.

In notes of a visit on July 21, 2006, Dr. Garwood stated that plaintiff "continues

with voice of a toddler boy; yet, vocabulary is adult; can abstract; uses wit; pt aware of his

regression; this is **NOT** conscious manipulation; it is regression as a defense . . . pt

responds with child-like appreciation when I gave him a small, cheap, colorful flashlight

from my desk; he had expressed a lot of interest in it."

On October 27, 2006, Dr. Garwood opined that plaintiff had PTSD and organic

psychosis and personality disorder due to a traumatic brain injury.  He added that "PT IS

COMPLETELY AND PERMANENTLY DISABLED DUE TO HIS CHRONIC MENTAL

ILLNESSES.

In a letter signed on July 31, 2007, Dr. Garwood stated that plaintiff's case had been,

for himself and other examiners in the medical records he had reviewed, "unusually difficult

FINDINGS AND RECOMMENDATION - 14

to sort out or refine diagnostically and etiologically." He reported that Ms. Coffman told him that plaintiff referred to combat experience in Panama, and he noted that plaintiff had "made vague references to combat on several occasions" in his office. Dr. Garwood reported that Ms. Coffman said that plaintiff continued to have "waxing and waning levels of regressed behavior, from nearly toddler-like, to perhaps young teens in style, but never as a full adult." Ms. Coffman reported that plaintiff continued to "have vivid and disturbing auditory hallucinations with panic-like reactions," and that he could take care of only "his most basic needs like feeding himself, dressing, cleaning, etc." but could not take care of his medications or money. Dr. Garwood recalled that plaintiff frequently demonstrated symptoms of hallucinations, hyper-vigilance, panic, and anxiety, and had made "early references to combat, intrusive thoughts and some triggering phenomenon like 'scarey movies' and the news." He added that plaintiff tended to "dissociate into primitive, even child-like states and shows convincing symptoms of paranoid delusions."

In summarizing his impressions, Dr. Garwood stated that his

> differential diagnoses have included PTSD; organic personality disorder NOS; R/O traumatic brain injury; and co-morbid ADHD. I have considered various dementing illnesses, but no evidence or verified etiology for these has yet been discovered. In addition, his condition has not deteriorated in a pattern consistent with classic forms of dementia. I have considered R/O malingering, factitious disorder and conversion reaction as well, but did not list these initially in his chart for concerns that these diagnoses are best approached by a long process of careful exclusion and in order to not prejudice 3rd parties and/or alienate the patient.

> Having said all this, I cannot say that this patient has a military related PTSD for certain, given that I have no practical way to determine his military exposure to trauma. However, pt does have many signs and symptoms consistent with PTSD from some kind of trauma in the past. His regression and dissociations are so primitive in nature that I suspect at least much of his trauma occurred when he was developmentally much younger, such as when he was a child. Nonetheless, this is still consistent with a type of PTSD.

Lastly, on a couple of occasions I have candidly observed this patient behave consistently at times when he would not have a clue that he was being watched by me or any clinician.  Regardless of the diagnoses and etiology I am convinced that this patient is disabled.

### Hypothetical and Vocational Expert's Testimony

During the hearing, the ALJ posed a hypothetical to the VE describing a 47-year-old individual with a high-school education and plaintiff's work experience who could occasionally lift 50 pounds and frequently lift 25 pounds, could stand for six hours and sit for six hours during an eight-hour work day, needed to avoid overhead work and have limited interaction with the general public, and who could not perform detailed tasks or follow detailed instructions.  The VE testified that such an individual could not perform any of plaintiff's past relevant work, but could work as a dishwasher, a hand packager, or a janitor.

### ALJ's Decision

At the first step of her disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability.

At the second step, the ALJ found that plaintiff's "severe" impairments included post-operative problems related to two fusion procedures at the C5-7 levels of his spine, methamphetamine abuse, antisocial personality disorder with histrionic traits, and malingering.  Plaintiff contends that the finding of malingering was improper and that the ALJ erred in failing to consider his obesity.

At the third step, the ALJ found that plaintiff's impairments did not medically equal any listed impairment that would be presumptively disabling.  Plaintiff asserts that the ALJ erred in failing to find that his mental impairments were disabling.

The ALJ determined that plaintiff retained the functional capacity required to perform medium physical work activity that required no overhead reaching. She found that he could tolerate only limited interaction with the general public, and could not perform detailed tasks and instructions. Based upon this analysis of plaintiff's residual functional capacity, the ALJ concluded that plaintiff could not perform his past relevant work. Plaintiff agrees that he cannot perform his past relevant work, but contends that the ALJ did not accurately assess his residual functional capacity.

At the fifth step of her analysis, the ALJ found that plaintiff retained the functional capacity required to work as a dishwasher, a janitor, or a hand packager.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." <u>Andrews</u>, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

**<u>Discussion</u>**

1. <u>ALJ's Findings at Step Two</u>

As noted above, at step two of her evaluation, the ALJ found that plaintiff's severe impairments included post-operative problems related to two fusion procedures at the C5-7 levels of his spine, methamphetamine abuse, antisocial personality disorder with histrionic traits, and malingering.  Plaintiff contends that the ALJ erred in failing to consider his obesity and to account for his chronic knee pain and his need to use a cane for ambulation, and erred in failing to consider how these problems could reduce his ability to perform medium work.

These arguments are well taken.  Social Security Ruling (SSR) 02-1p requires that an ALJ explain how he or she determined whether a claimant's obesity caused physical or mental impairments.  The ALJ here did not do so, and did not address plaintiff's use of the cane, a "hand-held assistive device," as required by relevant regulations.  <u>See</u> 20 C.F.R. § 404, Subpart P, Appendix 1, Section 1.00 (J)(4).

The Commissioner concedes that an ALJ is required to consider the effects of a claimant's obesity.  However, he cites <u>Burch v. Barnhart</u>, 400 F.3d 676, 683 (9th Cir. 2005) in support of his contention that the ALJ's failure to do so here did not constitute error because plaintiff failed to identify how his obesity would affect the ALJ's analysis.  The

Commissioner's reliance upon <u>Burch</u> is misplaced.  There, the ALJ had expressly considered the plaintiff's obesity in evaluating his residual functional capacity.  The ALJ here, unlike the ALJ in <u>Burch</u>, did not mention plaintiff's obesity, much less evaluate the effect of plaintiff's obesity on his functional capacity.

2. <u>ALJ's Step Five Analysis</u>

As noted above, the ALJ found that plaintiff could not perform detailed tasks and instructions, and could work as a dishwasher, a janitor, or a hand packager.  Plaintiff contends that the ALJ erred in concluding that he could perform this work, because each of the jobs in question require the ability to carry out detailed instructions.

This argument is also well taken.  The VE testified that an individual who could not perform detailed tasks or instructions could perform these jobs.  However, according to the <u>Dictionary of Occupational Titles</u> (DOT) these tasks all require the ability to reason at level two on the "Reasoning" scale.  This level requires an individual to have the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions."

Plaintiff correctly notes that, in <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435, the Ninth Circuit held that an ALJ may rely on VE testimony that deviates from the DOT "only insofar as the record contains persuasive evidence to support the deviation."  Here, the VE's testimony is inconsistent with the DOT, and there is no evidence in the record supporting the deviation.

3. <u>ALJ's Rejection of Opinions of Treating and Examining Physicians</u>

a. <u>Applicable rules</u>

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. <u>Rodriguez v. Bowen</u>, 876 F.2d 759, 761-62 (9th Cir. 1989).  Accordingly, an ALJ must support the rejection of a treating physician's opinion with "findings setting forth specific and legitimate reasons for doing so that are based on substantial evidence in the record." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions.  <u>Lester v. Chater</u>, 81 F.2d 821, 830-31 (9th Cir. 1995).

The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician.  <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, <u>id.</u>, and must provide specific and legitimate reasons that are supported by substantial evidence in the record for rejecting an examining physician's opinion that is contradicted by another physician.  <u>Andres v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995).

An ALJ may not substitute his or her opinion for that of a qualified physician.  <u>See</u>, <u>e.g.</u>, <u>Bilby v. Schweiker</u>, 762 F.2d 716, 719 (9th Cir. 1985).


b. <u>Analysis</u>

Plaintiff contends that the ALJ failed to provide adequate bases for rejecting the opinions of Drs. Pearson, Gilbert, and Davis, who were examining physicians, and the opinion of Dr. Garwood, plaintiff's treating physician.  He also asserts that the ALJ erred in

FINDINGS AND RECOMMENDATION - 20

diagnosing plaintiff as "malingering" in the absence of any such diagnosis by a treating or examining physician. The Commissioner concedes that the ALJ erred in finding that plaintiff's severe impairments included malingering, but contends that this error was harmless. The Commissioner contends that the ALJ provided legally sufficient support for her rejection of the opinions of the other medical experts.

Plaintiff correctly notes that the ALJ went beyond the medical record in making a diagnosis of malingering that was not made by any treating or examining doctor. The ALJ followed the diagnosis of malingering with a citation to the *The Diagnostic and Statistical Manual of Mental Disorders–Fourth Edition*, and summarized and paraphrased the definition of malingering in that reference at length. There was some evidence of malingering in the record. Following her first examination of plaintiff, Dr. Davis did give a differential diagnosis of conversion disorder, facticious disorder, and malingering. However, based upon a later examination, she concluded that a conversion disorder was "more likely than malingering." She added that individuals with a conversion disorder are not "volitionally 'faking' their presentation." Though Dr. Gilbert, an examining doctor, observed that "history suggests that his test results are colored by emotional state and the possibility of primary and secondary gain," he noted that it was difficult to "fake a pattern of lateralization," and did not diagnose malingering. Dr. Garwood, plaintiff's treating physician, noted that he had considered a diagnosis of "R/O malingering, factitious disorder, and conversion reaction," and had ultimately concluded that, regardless of origin or diagnosis of his symptoms, plaintiff was disabled. Dr. Garwood noted that he had "candidly observed" plaintiff consistently exhibit disabling symptoms "at times he would not have a clue that he was being watched" by Dr. Garwood or "any clinician." Dr. Pearson, who performed a psychodiagnostic assessment

at the request of the Agency, concluded that plaintiff's odd gait and body movements were "not something he produced for the examiner." He noted that plaintiff exhibited this same behavior while plaintiff was walking in town with his girlfriend a few hours after the examination. Dr. Pearson concluded that plaintiff was "absolutely unemployable."

In the absence of any diagnosis of malingering made by a treating or examining physician, the ALJ's diagnosis of malingering was not supported by the medical record, and was improper. It also constituted reversible error, because it is clear from the hearing transcript and the ALJ's decision that the ALJ's conclusion that plaintiff was a malingerer profoundly affected her assessment of his claim. Based upon her conclusion that plaintiff was malingering, the ALJ rejected "the various diagnostic theories given by various reviewers and examiners in an attempt to account for a broad spectrum of the claimant's alleged physical and mental symptomatology . . . ." TR at 18. Under these circumstances, the ALJ's error in diagnosing malingering was not harmless, and requires reversal of the ultimate decision.

As noted above, an ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of examining and treating doctors, and must provide specific and legitimate reasons, which are supported by the record, for rejecting opinions that are contradicted. Because she based her assessment of the medical record largely on her own diagnosis of malingering, the ALJ did not provide sufficient reasons for rejecting the opinions of plaintiff's examining and treating physicians. An argument can be made here for the application of either the "clear and convincing" or "specific and legitimate" standards. The treating and examining doctors generally agreed that plaintiff was profoundly impaired, and assessed him with limitations that were clearly disabling. However, there was some

disagreement as to the <u>cause</u> of his impairment: The mental health experts generally thought that plaintiff's impairments resulted from some organic cause, while those like Dr. Davis who specialized in neurological disorders thought that his impairments stemmed from mental health problems.

Regardless of which standard is applied, the ALJ did not provide sufficient reasons for rejecting the opinions indicating that plaintiff's impairments were disabling. The ALJ rejected these opinions because she found that plaintiff was malingering, and assumed that the examining and treating doctors had based their opinions on incomplete and inaccurate information provided by plaintiff and his girlfriend. The ALJ was most troubled by assertions that plaintiff had served in the military in Panama and in the Gulf War, though his service records established that he had not left the United States. Certainly, there was evidence that plaintiff and his girlfriend supplied some erroneous information to examining and treating doctors.[3] However, regardless of the extent to which plaintiff and his girlfriend may have misinformed doctors as to plaintiff's history and condition, it is clear that plaintiff's treating and examining doctors formed their opinions based at least in part on objective testing and observation. In addition, the record establishes that, in forming their opinions, they accounted for the possibility that some of the information they were provided was incorrect. Plaintiff's examining and treating doctors reported their observations of plaintiff's behavior, and addressed the possibility that plaintiff was feigning his symptoms. All concluded that he was not.

---

[3]There is, of course, some question as to the state of plaintiff's memory and knowledge after April, 2004, and as to the extent to which plaintiff's girlfriend knowingly provided misinformation about plaintiff's history.

Though the ALJ failed to provide sufficient reasons for rejecting all of the opinions in question, the inadequacy of her assessment of the opinion of Dr. Pearson, who performed a psychodiagnostic assessment at the Agency's request, is most obvious. In her assessment of the evidence, the ALJ did not even mention Dr. Pearson's opinion, much less give "clear and convincing" or "specific and legitimate reasons" for its rejection. The ALJ did state that, when he was examined by "a Social Security consultative psychologist, who had no review of record," plaintiff was accompanied by his girlfriend, who provided information. The ALJ did note that plaintiff's girlfriend made false statements concerning plaintiff's military record and drug use. However, she made no mention of Dr. Pearsons' opinion that plaintiff was not feigning his odd body movements and gait, his report that he had later observed plaintiff demonstrating the same gait while walking in town hours after the interview, or his ultimate conclusion that plaintiff was "absolutely unemployable" and would need a care provider to live in the community.

The Commissioner contends that, though the ALJ "did not identify Dr. Pearson by name . . . she clearly discussed his opinion in her decision." This is not correct. Though the ALJ may have implied that she rejected Dr. Pearson's opinion because it was based upon misinformation provided by plaintiff's girlfriend, she did not directly address the opinion, and provided neither clear and convincing nor specific and legitimate reasons for its rejection.

When an ALJ provides inadequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). A reviewing court then has discretion to remand the action for further proceedings or for a finding of disability and an award of benefits. See, e.g, Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985). Whether an action is remanded for an award of

benefits or for further proceedings depends on the likely utility of additional proceedings.
Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit the evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the ALJ did not provide legally adequate reasons for rejecting the opinions of the medical experts who evaluated and treated plaintiff.  Those opinions are therefore credited as a matter of law.  There are no outstanding issues that must be resolved before a determination of disability can be made, and there is no doubt that, if the opinions of Drs. Davis, Gilbert, Pearson, and Garwood were accepted, an ALJ would be required to find that plaintiff is disabled.  Under these circumstances, this action should be remanded to the Agency for an award of benefits.


4. Conclusion that Plaintiff's Combined Impairments did not Meet or Equal an Impairment in the Listings

Plaintiff contends that the ALJ erred in failing to address why plaintiff's combined impairments did not meet or equal Listings 12.02, 12.05C, 12.05D, 12.06, and 12.08. Though my conclusion that this action should be remanded for an award of benefits for the reasons set out above makes it unnecessary to do so, I briefly note my agreement with this contention.

The ALJ found that plaintiff's severe physical impairment limited him to medium work. This, combined with plaintiff's IQ scores determined by Dr. Gilbert's testing, is sufficient to satisfy Listing 12.05C. The ALJ did not discuss or address Dr. Gilbert's findings as to plaintiff's IQ.

Plaintiff also contends that the findings of Drs. Garwood, Pearson, Davis, and Gilbert establish that he has mental impairments that meet, or are at least medically equal to, Listings 12.02, 12.05D, 12.06, and 12.08, because they result in marked limitations in plaintiff's ability to carry out activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace. This argument is well taken. As noted above, the ALJ did not provide an adequate basis for rejecting these doctor's assessment of plaintiff's mental impairments. If these medical sources' opinions concerning the severity of plaintiff's mental impairments are accepted, plaintiff's mental limitations are sufficiently severe to meet or equal these Listings.

## Conclusion

For the reasons set out above, a judgment should be entered REVERSING the Commissioner's decision and REMANDING this action for an award of benefits. As noted above, plaintiff concedes that the onset-of-disability date of November 25, 2000, is not correct, and asserts that the appropriate date of the onset of his disability is April, 2004. The judgment should state that, on remand, it will be necessary for the Agency to determine the correct onset-of-disability date.

**<u>Scheduling Order</u>**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due June 21, 2010.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 1st day of June, 2010.


/s/  John Jelderks_____
John Jelderks
U.S. Magistrate Judge